```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
RICHARD FERNANDEZ,                 : 10 Civ. 9011 (ALC) (JCF)
                                   :
             Petitioner,           :        REPORT AND
                                   :        RECOMMENDATION
      - against -                  :
                                   :
SUPT. WILLIAM A. LEE,              :
                                   :
             Respondent.           :
- - - - - - - - - - - - - - - - - -:
```

TO THE HONORABLE ANDREW L. CARTER, JR., U.S.D.J.:

   Richard Fernandez brings this pro se petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges his
convictions for assault in the first degree, four counts of robbery
in the first degree, and two counts of robbery in the second degree
following a jury trial in New York State Supreme Court, New York
County.  He contends that (1) he received ineffective assistance of
trial counsel; (2) his delayed arraignment violated his right to
counsel; (3) he was arrested without probable cause, and that
illegal arrest tainted all of the prosecution's evidence; (4) the
trial judge erred in not suppressing his post-Miranda statements as
tainted by his earlier statement, which had been suppressed; and
(5) the trial judge erred in denying his request for a jury charge
on the voluntariness of his statements.[1]  Because Mr. Fernandez has

_____
   [1] In order to give this pro se petitioner the benefit of any
doubt, I am construing his petition to incorporate the arguments
contained in his brief on direct appeal to the Appellate Division,
First Department.  (Brief for Defendant-Appellant ("Pet. App.

not yet exhausted his first two contentions in state court, he has now applied for a stay of his petition while he pursues a writ of error coram nobis in state court. For the reasons set forth below, I recommend that the application for a stay be denied and the petition be denied as well.

Background

    A.   The Incidents

On December 5, 2005, Martin Whittman was walking back to his apartment at 315 West 102nd Street in Manhattan. (Trial Transcript ("Tr.") at 66-67). As Mr. Whittman opened the door to his apartment building, Mr. Fernandez and a companion, Abel Aquino, pushed him through the doorway and onto the floor. (Tr. at 67). With the petitioner standing eighteen inches behind him, Mr. Aquino pulled Mr. Whittman up and grabbed Mr. Whittman's pills and Metrocard out of his coat pocket. (Tr. at 68, 75). Both assailants were holding box cutters at this time. (Tr. at 68, 75). Seeing the box cutters, Mr. Whittman took his money out of his wallet and handed the bills to Mr. Fernandez and Mr. Aquino. (Tr. at 68-69). The assailants took Mr. Whittman's money, handed him back his medication, and then fled. (Tr. at 70-71, 76-77).

---

Brief"), attached as Exh. A to Declaration of Priscilla Steward dated April 20, 2012 ("Steward Decl.").

Shortly before 1:00 a.m. on December 15, 2010, Melvin Freilich was walking back to his apartment on West 102nd Street, between West End Avenue and Riverside Drive. (Tr. at 185-86). Near the middle of the block, Mr. Fernandez and Mr. Aquino jumped out from behind a van and a stoop, respectively, and surrounded Mr. Freilich on the sidewalk. (Tr. at 186-87). The petitioner was holding a knife at this time. (Tr. at 187, 195). The assailants wrestled Mr. Freilich to the ground and stabbed him in the leg in the process. (Tr. at 187, 189). They placed Mr. Freilich on the stoop, where Mr. Aquino held him down while Mr. Fernandez brandished a knife. (Tr. at 187). As Mr. Freilich attempted to pull money out of his pocket, Mr. Fernandez "whack[ed] [him] in the forehead" with the knife, causing Mr. Freilich to bleed. (Tr. at 188). Mr. Freilich then pulled his cash out and handed it to Mr. Fernandez; the petitioner and Mr. Aquino then ran away. (Tr. at 188). Mr. Freilich then ran home and called 911. (Tr. at 188) He spent the night in the emergency room being treated for cuts on his forehead and stab wounds in his leg and chest. (Tr. at 189).

On the evening of December 23, 2005, Richard Hamilton was walking back to his apartment at 35 West 88th Street, between Columbus Avenue and Central Park West. (Tr. at 91-92). As Mr. Hamilton neared the door of his apartment building and took out his

keys, the petitioner approached him from the left. (Tr. at 93).
Mr. Fernandez stabbed Mr. Hamilton three times in the left shoulder
and said "I've stabbed you three times." (Tr. at 93-94, 107). The
petitioner then jumped in front of Mr. Hamilton and demanded, "Give
me your money. If you say anything I'll kill you there." (Tr. at
94, 108). Mr. Hamilton handed his money to the petitioner, who
stabbed Mr. Hamilton in the chin and the right shoulder. (Tr. at
94, 108). During the scuffle, Mr. Fernandez also cut himself on
both hands. (Pre-Trial Suppression Hearing Transcript ("Supp.
Tr.") at 215). After taking Mr. Hamilton's money, Mr. Fernandez
fled toward Central Park. (Tr. at 95, 108). Mr. Hamilton walked
into his apartment building, where the landlord came out and called
911. (Tr. at 95). Mr. Hamilton was hospitalized for four days and
received a transfusion of two pints of blood. (Tr. at 96-97).

   B. <u>The Arrest</u>

   Shortly after 10:30 p.m. on December 23, 2005, Police Officer
Richard Brennan received a report over his hand-held radio that
there had been a stabbing in the vicinity of 88th Street and
Central Park West. (Tr. at 24-25). Officer Brennan saw Mr.
Fernandez enter Central Park alone near 90th Street; he followed
the petitioner in his squad car and then on foot. (Tr. at 25-27).
Upon approaching Mr. Fernandez from the rear, Officer Brennan

noticed "some blood spot" on the petitioner's leg.  (Tr. at 27).
Officer Brennan had "a little conversation" with the petitioner,
who told him that he was out getting fresh air after a fight with
his girlfriend.  (Tr. at 27-28).  During the conversation, Officer
Brennan noticed a "stab wound" on the petitioner's hand.  (Supp.
Tr. at 18).   Mr. Fernandez claimed that his girlfriend had
scratched him, but Officer Brennan did not believe that that type
of wound could be inflicted by a fingernail.  (Supp. Tr. at 20).

Other officers also arrived and began canvassing the area for
objects "that don't belong there."  (Tr. at 29).   During their
search, officers found a folded pocket knife with blood on it under
a bench about eight feet from where Office Brennan stopped the
petitioner.  (Tr. at 29, 32).  After being shown the knife, Officer
Brennan drove to the site of the stabbing to speak to the
detectives on the scene.  (Tr. at 29-30).  He then returned to
where he had stopped Mr. Fernandez, placed him under arrest, and
drove him to the police precinct.  (Tr. at 30).

C. <u>The Questioning</u>

When Mr. Fernandez arrived at the police precinct, Detective
Antonio Leon drove him to the hospital where Mr. Hamilton, the
victim, was receiving treatment.  (Supp. Tr. at 96-97).  Detective
Leon interviewed Mr. Hamilton, who described his assailant as

wearing white sneakers, blue jeans, and a black or gray hoody; this description matched the petitioner's attire at the time of arrest. (Supp. Tr. at 98).  Detective Leon then led Mr. Fernandez into the victim's room.  (Supp. Tr. at 98).  Upon seeing the petitioner, Mr. Hamilton said, "[T]hat's not the guy."   (Supp. Tr. at 98). Detective Leon then returned the petitioner to the police station. (Supp. Tr. at 99).

Detective Jose Alfonso then interviewed Mr. Fernandez.  (Supp. Tr. at 100).  The petitioner told Detective Alfonso that he had had an argument with his girlfriend at her apartment about their marriage paperwork and that he left to take a walk and cool down. (Supp. Tr. at 162-63).  The petitioner became combative during this conversation, and he began yelling and "banging his head against the metal bar."  (Supp. Tr. at 163).  A sergeant then wrapped the metal bar in a blanket so Mr. Fernandez would not hurt himself. (Supp. Tr.  at 163).  The petitioner began to cry, but Detective Alfonso believed the petitioner was simulating.  (Supp. Tr. at 164-65).  The detective then let the Mr. Fernandez speak privately to his friend, Tito.  (Supp. Tr. at 166-67).

Because Detective Alfonso did not believe the petitioner would divulge any further information, he "decided to use a ruse" in which he would inform Mr. Fernandez that the police had a knife

with the victim's blood and the petitioner's blood on it.  (Supp. Tr. at 167-68).  Detective Alfonso also told Mr. Fernandez that he would be charged with murder if Mr. Hamilton died.  (Supp. Tr. at 168-69).  Mr. Fernandez then began to "shak[e] his head no" and cry.  (Supp. Tr. at 171).  Mr. Fernandez indicated he wanted to tell Detective Alfonso "what really happened;" the petitioner was read his <u>Miranda</u> rights in both English and Spanish, and he waived them in both languages.  (Supp. Tr. at 170-73).  This took place at 5:30 a.m. on December 24.  (Supp. Tr. at 177).  The petitioner then wrote a statement in Spanish claiming he "punched [Mr. Hamilton] with the knife" but did not know whether it stabbed him.  (Supp. Tr. at 175).  Detective Alfonso then let Mr. Fernandez speak to his girlfriend; after she left the room, Detective Alfonso informed the petitioner that he would leave and not return.  (Supp. Tr. at 179).

Detective Juan Reyes arrived at the police precinct at approximately 12:25 p.m. and began to speak to Mr. Fernandez. (Supp. Tr. at 53).  At that time, Detective Reyes read Mr. Fernandez his <u>Miranda</u> rights, which he waived.[2]  (Supp. Tr. at 51-53).  Prior to this interview, Detective Reyes did not ask Officer Brennan, Detective Alfonso, or Mr. Fernandez about the substance of the earlier interrogations.  (Supp. Tr. at 76-77).  Detective Reyes

---

[2] Detective Reyes did not Mirandize Mr. Fernandez in Spanish because the petitioner indicated that he felt comfortable speaking English.  (Supp. Tr. at 72).

7

first began questioning the petitioner about the incident with Mr. Freilich, at which point Mr. Fernandez confessed to using a knife to rob Mr. Freilich, along with his associate, Abel. (Supp. Tr. at 53, 55-56).

Detective Reyes then questioned Mr. Fernandez about the incident with Mr. Whittman. (Supp. 56-57). The petitioner told Detective Reyes that he and Abel stole money from Mr. Whittman while Abel brandished a knife. (Supp. Tr. at 61). Detective Reyes did not discuss the stabbing of Mr. Hamilton with the petitioner. (Supp. Tr. at 64). Because Mr. Fernandez did not feel comfortable writing down his statement, Detective Reyes wrote it for him. (Supp. Tr. at 74). Detective Reyes did not have the petitioner sign at the bottom of the written statement. (Supp. Tr. at 74). This interview lasted about an hour, and Detective Reyes then drove Mr. Fernandez to the District Attorney's office. (Supp. Tr. at 62). Mr. Fernandez, with no detectives present, gave a videotaped statement to Assistant District Attorney Evan Krutoy. (Tr. at 132).

D. <u>Procedural History</u>

A New York County grand jury returned an indictment charging Mr. Fernandez with Attempted Murder in the Second Degree in violation of New York Penal Law ("Penal Law") § 125.25(1), Assault

in the First Degree (Penal Law § 120.10(1)), five counts of Robbery in the First Degree (Penal Law §§ 160.15(1), 160.15(3)), and two counts of Robbery in the Second Degree (Penal Law § 160.10(1)).

   1. <u>Pre-Trial Suppression Hearing</u>

On May 24, 2006, Justice Charles Solomon held a hearing on the petitioner's motion to suppress his statements to law enforcement personnel.  The prosecution called four witnesses: Officer Brennan, the arresting officer, and Detectives Reyes, Leon, and Alfonso, all of whom spoke to Mr. Fernandez after his arrest.  Petitioner's counsel, Norman Williams, cross-examined all four witnesses, paying extra attention to Detective Alfonso.

In closing arguments, Mr. Williams moved to suppress all physical evidence and all of Mr. Fernandez's statements.  (Supp. Tr. at 216-17).  He argued that Officer Brennan did not have probable cause to arrest the petitioner because (1) he could not have been sure, given the surrounding trees and dim lighting, that Mr. Fernandez had blood on his pants; and (2) he did not see the petitioner discard the knife found under the nearby bench.  (Supp. Tr. at 218-19).  Mr. Williams further argued that the petitioner's oral statements to Detective Alfonso should be suppressed because he was given his <u>Miranda</u> warnings in the middle of the interview, rather than at the beginning.  (Supp. Tr. 220, 222-23).  Mr.

Williams argued that petitioner's statements to Detective Alfonso were not voluntary due to the emotional distress he was under during questioning, as evidenced by Mr. Fernandez's statements that he wanted to kill himself. (Supp. Tr. at 226-27). Petitioner's counsel also claimed that the later statements to Detective Reyes and ADA Krutoy should be suppressed because they were tainted by the earlier statements to Detective Alfonso. (Supp. Tr. at 228). Mr. Williams argued that the break between Detective Alfonso's interrogation and Detective Reyes' interrogation was insufficient to cause attenuation between the two interviews. (Supp. Tr. at 228). The prosecutor argued that Officer Brennan had probable cause to arrest Mr. Fernandez after seeing the blood on his pants and the cuts on his hand. (Supp. Tr. at 229-30). He also argued that, because Mr. Fernandez made no "inculpatory" statements before Detective Alfonso gave him <u>Miranda</u> warnings, all his statements in that interview should be admissible. (Supp. Tr. at 234). The prosecutor argued that Detective Reyes and ADA Krutoy's questioning was completely separate from Detective Alfonso's interview, so those statements should be admissible too. (Supp. Tr. at 236). He further maintained that the fact that Mr. Fernandez lied during his statements proved that he spoke voluntarily. (Supp. Tr. at 235-36).

Justice Solomon held that the police "certainly had probable cause to arrest" Mr. Fernandez. (Supp. Tr. at 257). He reasoned that the blood on his pants and the wound on his hand, as well as the petitioner's proximity to the stabbing and to a bloody knife, gave Officer Brennan probable cause. (Supp. Tr. at 257-58). Justice Solomon also held that Mr. Fernandez's statements to the officer were admissible because the casual questioning "did not constitute interrogation." (Supp. Tr. at 259). He further held that all of the petitioner's statements to Detective Alfonso were inadmissible because the post-<u>Miranda</u> statements were tainted by the "ruse prior to advising [Mr. Fernandez] of his rights." (Supp. Tr. 260-61). The judge declared that the statements made to Detective Reyes and ADA Krutoy were admissible because of the pronounced break -- in terms of both time and personnel -- between Mr. Fernandez's statements to Detective Alfonso and his others. (Supp. Tr. at 261-64). He finally held that all of the petitioner's statements were voluntarily given because he was "treated fairly by the police" and never requested to have an attorney present. (Supp. Tr. at 264-65).

   2. <u>The Trial</u>

Petitioner's counsel actively participated in the jury selection process, questioning several jurors on their ability to

place the burden of proof on the prosecution.  (Voir Dire Transcript ("Voir Dire") at 69-70).   He also made clear to prospective jurors that they could not hold Mr. Fernandez's decision not to testify against him.  (Voir Dire at 70).

At trial, the prosecution called nine witnesses, including Officer Brennan, Detectives Alfonso and Reyes, and all three of Mr. Fernandez's victims.   Officer Brennan testified regarding the circumstances of the arrest (Tr. at 24-42); Officer Robert Sirigano spoke about photographing the blood at Mr. Hamilton's apartment building and the knife found under the bench.  (Tr. at 46-64).   The prosecution also called Officer Benjamin White, who spoke about canvassing the vicinity of 102nd Street for suspects in the attack on Mr. Freilich.   (Tr. at 79-85).   Detective Regina Burgos, an "expert in fingerprint development," testified that no fingerprints were found on the knife because Mr. Fernandez's sweat likely removed them.   (Tr. at 112, 118).   Detective Reyes then described his investigation of the attacks on Mr. Whittman and Mr. Freilich, as well as his interrogation of Mr. Fernandez.   (Tr. at 120-32). The prosecution also called Nara Ahmed, and petitioner's counsel conducted a voir dire concerning her expertise in forensic biology. (Tr. at 153-54).  Ms. Ahmed testified that she was able to match the DNA of Mr. Fernandez and Mr. Hamilton with the blood on the

knife.  (Tr. at 165-66).  Finally, Mr. Whittman, Mr. Freilich, and Mr. Hamilton all testified regarding their encounters with Mr. Fernandez.  (Tr. at 66-77, 92-109, 185-96).  Petitioner's counsel cross-examined all prosecution witnesses except for the three victims.  (Tr. at 77, 109, 196).

Before closing arguments, petitioner's counsel moved for a jury charge on the voluntariness of Mr. Fernandez's statements.  (Tr. at 206-09).  Mr. Williams requested the jury instruction because "reasonable people [could] disagree as to what condition Mr. Fernandez was in at the time of the . . . statements." (Tr. at 207).  The judge did not adopt this instruction, however, because there was no factual dispute at trial regarding the length of custody or the petitioner's mental or physical condition during interrogation.  (Tr. at 209).

During his closing argument, petitioner's counsel highlighted for the jury the facts that Mr. Fernandez had been in custody for over twelve hours and that the police took advantage of his mental and physical exhaustion to coax confessions out of him.  (Tr. at 214, 217).  Mr. Williams also claimed that Mr. Hamilton's blood on the knife did not prove that Mr. Fernandez had intentionally stabbed him.  (Tr. at 212-13).  The prosecutor then argued that the petitioner's detailed confession on the videotape proved that his

13

statements were both true and voluntary.  (Tr. at 219-21).  He also asked the jury to rely on the DNA on the knife to link Mr. Fernandez to Mr. Hamilton's stabbing.  (Tr. at 224-25).

The jury found the petitioner guilty of assault in the first degree, four counts of robbery in the first degree, and two counts of robbery in the second degree.  (Tr. at 276-79).  On February 22, 2007, the court sentenced Mr. Fernandez to a twenty-year prison term, plus five years of post-release supervision.  (Sentencing Transcript at 15).

### 3. Direct Appeal

Jonathan M. Kirshbaum of the Center for Appellate Litigation represented the petitioner on direct appeal before the Appellate Division, First Department.  In his brief, he argued three points: (1) the trial court erred in denying petitioner's motion to suppress his statements to the police because there was no probable cause to arrest him; (2) the trial court should have suppressed the petitioner's statements to Detective Reyes and ADA Krutoy because the prosecution failed to prove that they were sufficiently attenuated from his initial unlawfully obtained statement; and (3) the trial court improperly denied petitioner's request for a jury instruction on the voluntariness of the petitioner's statements (Pet. App. Brief at 28, 45, 60).

On December 8, 2009, the Appellate Division affirmed Mr. Fernandez's conviction.  People v. Fernandez, 68 A.D.3d 469, 469, 891 N.Y.S.2d 338, 339 (1st Dep't 2009).  It held that the police had "ample probable cause" to arrest Mr. Fernandez, especially given the wound to the petitioner's hand and the bloody knife found nearby.  Id. at 469-70, 891 N.Y.S.2d at 339.  The Appellate Division then held that the trial court "correctly found attenuation [from the first, suppressed statement] with regard to both of defendant's subsequent statements, given the lengthy passage of time, and the changes in location and interrogators." Id. at 470, 891 N.Y.S.2d at 339.  Finally, the Appellate Division held that "the [trial] court properly denied defendant's request to submit to the jury the issue of the voluntariness of his statements" because "the issue was never litigated at trial."  Id. at 470, 891 N.Y.S.2d at 339.

The petitioner sought leave to appeal the decision to the New York Court of Appeals, asking the court to review all of the claims he raised in his direct appeal.  On March 4, 2010, the New York Court of Appeals denied Mr. Fernandez's leave application.  People v. Fernandez, 14 N.Y.3d 800, 899 N.Y.S.2d 134 (2010).

### 4. Petition for Habeas Corpus

On November 12, 2010, the petitioner filed a Petition for Writ of Habeas Corpus ("Pet.") with this Court.  Mr. Fernandez's habeas corpus petition is timely under federal law.  The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires a prisoner to file his federal habeas corpus petition within one year of his state court conviction becoming final.  28 U.S.C. § 2244(d)(1)(A).  This one-year statute of limitations "begins to run only after the denial of certiorari or the expiration of time for seeking certiorari."  Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).  The New York Court of Appeals denied the petitioner's leave application on March 4, 2010; his conviction became final ninety days later, on June 2, 2010.  Because Mr. Fernandez filed his petition on November 12, 2010, less than one year from the date his conviction became final, his petition is timely.

In his petition and subsequent reply papers, Mr. Fernandez advances five arguments as to why federal law requires overturning his conviction: (1) the trial erred in holding that the police had probable cause to arrest him (Pet. at 5a[3]); (2) the petitioner's written and videotaped statements were tainted by the lack of a "pronounced break" from his illegally obtained statement (Pet. at

---

[3] Petitioner has attached a sheet between pages 5 and 6 of his Petition for Writ of Habeas Corpus, which shall henceforth be referred to as page 5a.

5a); (3) the trial judge erred in denying the petitioner's request for a jury instruction on the voluntariness of the petitioner's confession (Pet. at 5a); (4) the petitioner received ineffective assistance of counsel because his trial attorney failed to call witnesses, determine the accuracy of the victims' medical records, or cross-examine key prosecution witnesses (Petitioner's Responsive Pleading to Opposition of Writ of Habeas Corpus dated May 9, 2012 ("Pet. Reply") at 2); and (5) the police violated his right to counsel by delaying his arraignment.  (Pet. Reply at 2).

Mr. Fernandez has not exhausted all claims presented in his petition.  Petitioner raised his first three claims -- illegal arrest, failure to suppress statements, and failure to give a voluntariness instruction -- on direct appeal.  He also petitioned to have the New York Court of Appeals review those claims. Therefore, petitioner's first three claims are exhausted.

As Mr. Fernandez acknowledges, however, he has not exhausted his claims regarding ineffective assistance of counsel and arraignment delay.  (Pet. at 8, 11).  He has now applied for a stay of his petition while he exhausts those claims through a writ of error coram nobis in state court.  (Letter of Richard Fernandez dated April 25, 2012).

17

Discussion

A.  <u>Federal Habeas Corpus Standard</u>

Prior to passage of the AEDPA, factual findings made by a state court after an evidentiary hearing were presumed correct in a federal habeas proceeding, but federal courts were not required to defer to state court determinations of law and of mixed questions of law and fact.  <u>See</u> <u>Thompson v. Keohane</u>, 516 U.S. 99, 107-12 (1995); <u>Brown v. Artuz</u>, 283 F.3d 492, 497 (2d Cir. 2002). Under the AEDPA, however, a writ of habeas corpus may not issue "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

The AEDPA standard applies to this case since Mr. Fernandez filed his petition after the Act's effective date.  <u>See</u> <u>Brown</u>, 283 F.3d at 498 n.2.  However, where, as here, the petitioner's claims fail under the less deferential pre-AEDPA standard, there is no need to conduct the AEDPA's more intricate analysis.  <u>See</u> <u>Kruelski</u> <u>v. Connecticut Superior Court for the Judicial District of Danbury</u>, 316 F.3d 103, 106 (2d Cir. 2003) (suggesting, in post-AEDPA cases, that habeas courts should assess first whether the state court's

ruling was erroneous under the "correct interpretation" of federal law at issue, then whether the ruling was unreasonable).

    B.   <u>Application for a Stay</u>

       1. <u>Standard for Stay and Abeyance</u>

In 1982, the United States Supreme Court held that federal district courts may not rule on so-called "mixed petitions," which involve both exhausted and unexhausted claims; courts should instead dismiss such cases without prejudice, thereby giving petitioners the opportunity to return to state court and giving state courts the opportunity to rule on the federal claims. <u>Rose v. Lundy</u>, 455 U.S. 509, 518-19 (1982). At that time, there was no statute of limitations for federal habeas petitions. Subsequently, the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") imposed a one-year limitation on such filings. 28 U.S.C. § 2244(d)(1). Given this restriction, dismissal of a habeas petition, regardless of whether it is with or without prejudice, can now cost a petitioner the opportunity to have a federal court hear any of his claims. To avoid this result, some courts have chosen to stay habeas petitions containing unexhausted claims and hold them in abeyance while the petitioner exhausts claims not previously presented to the state courts.

The Supreme Court has provided guidance with respect to these stay and abeyance decisions.  In keeping with the purposes of the AEDPA, "stay and abeyance should be available only in limited circumstances."  Rhines v. Weber, 544 U.S. 269, 277 (2005).  A stay should only be granted "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics."  Id. at 278.

### 2.  Ineffective Assistance of Counsel Claim

Mr. Fernandez's first unexhausted claim is that he received ineffective assistance of trial counsel.  (Pet. Memo. at 3-4).  The petitioner argues that his trial attorney's performance fell below constitutionally guaranteed standards because he failed to call witnesses, determine the accuracy of the victims' medical records, and cross-examine key prosecution witnesses.  (Pet. Reply at 2).

To prevail on an ineffective assistance of counsel claim, a criminal defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "the deficient performance prejudiced the defense."  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To demonstrate deficient performance, the petitioner must prove that his "counsel's representation fell below

an objective standard of reasonableness." Id. at 688.  To show that the deficient performance prejudiced the outcome, the petitioner must prove that the "likelihood of a different result [is] substantial, not just conceivable." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 792 (2011).

Mr. Fernandez's ineffective assistance of counsel claim does warrant granting a stay because it is meritless. See Martinez v. Ercole, No. 06 Civ. 13523, 2010 WL 1779351, at *7 (S.D.N.Y. Apr. 21, 2010) (denying stay and abeyance where petitioner claimed only that trial counsel failed to object to legally-sound jury charge and that trial counsel did not defend him vigorously enough). Though the petitioner may be unhappy with the outcome of his trial, the record demonstrates that his counsel's performance did not fall below "an objective standard of reasonableness." Strickland, 466 U.S. at 688.  The attorney cross-examined several prosecution witnesses (Tr. at 36-43, 140-50), but declined to cross-examine the victims; apparently they were highly sympathetic witnesses. Indeed, the petitioner was even acquitted on one count of first degree robbery and one count of attempted murder because of his counsel's efforts.  (Tr. at 278-79).

In addition, the petitioner does not indicate what he hoped to gain from his attorney questioning the accuracy of the Mr.

Hamilton's medical records.   He also does not specify what witnesses he wanted his counsel to call in his defense or what he hoped to gain from their testimony.   Therefore, it is impossible to find Mr. Fernandez's counsel ineffective on these grounds.   While petitioner's counsel may not have been entirely successful, he still "function[ed] as the 'counsel' guaranteed the defendant by the Sixth Amendment."   <u>Strickland</u>, 466 U.S. at 687.   The petitioner's claim, therefore, is meritless.

### 3. <u>Arraignment Delay Claim</u>

The petitioner also claims, for the first time, that the series of interrogations delayed his arraignment so long that it violated his right to counsel. (Pet. Memo. at 2-3).   He points out that he had spent over thirteen hours in police custody even before being taken to the District Attorney's office for his final round of questioning. (Pet. Memo. at 2-3).   The respondent counters that this claim "is based on matters in the record, and, therefore, should have been raised on direct appeal."   (Respondent's Memorandum of Law in Opposition to the petition for a Writ of Habeas Corpus ("Resp. Memo.") at 32).

In "determining whether dismissal of an indictment is the appropriate remedy for a Sixth Amendment violation" caused by a delayed arraignment, courts should consider "(1) the length of the

22

delay; (2) the reason for the delay; (3) whether defendant had asserted his rights; and (4) the prejudice to the defendant resulting from the delay." <u>United States v. Lainez-Leiva</u>, 129 F.3d 89, 91-92 (2d Cir. 1997) (citing <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972)).  "None of these factors is 'either a necessary or sufficient condition to a finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant.'" <u>Parrilla v. Goord</u>, No. 02 Civ. 5443, 2005 WL 1422132, at *5 (S.D.N.Y. June 20, 2005) (quoting <u>Barker</u>, 407 U.S. at 533).

Under the <u>Barker</u> test, Mr. Fernandez's claim is meritless. The petitioner does not claim that the arraignment delay impaired his defense in any way, and he does claim any other sort of prejudice.  Furthermore, he brings forward no evidence of the time at which he was arraigned, so it is impossible to determine the length of the delay and whether that delay was unconstitutionally protracted.  His arraignment was also delayed by several hours because Mr. Fernandez said he wanted to tell the police "what really happened" (Supp. Tr. at 170), and because he was being interviewed about three separate incidents.  (Supp. Tr. at 72, 175).  Finally, the petitioner never asserted his rights to counsel and speedy arraignment, as shown by his repeated waiver of his

<u>Miranda</u> rights.  (Supp. Tr. at 51-53; Tr. at 132).  Therefore, Mr. Fernandez's delayed arraignment claim is without merit.

### 4. <u>Denial of Stay and Abeyance</u>

The petitioner has failed to satisfy the standard for stay and abeyance of federal habeas proceedings.  Both of Mr. Fernandez's unexhausted claims are plainly meritless, meaning he would not be entitled to habeas relief even after exhausting those claims. Accordingly, his application for a stay should be denied.

### C. <u>Merits of Exhausted Claims</u>

### 1. <u>Illegal Arrest Claim</u>

Mr. Fernandez's first claim in his petition is that the trial judge erred in not suppressing his statements as fruits of an illegal arrest.  (Pet. at 5a).  He claims that the police did not have probable cause to arrest him, and that all statements that flowed from that arrest -- meaning every statement he made to the police -- should be inadmissible.  (Pet. App. Brief at 28-29).  To demonstrate the lack of probable cause, the petitioner points to the fact that at the showup Mr. Hamilton definitively stated, "That's not the guy." (Pet. at 5a).

Federal law prohibits raising tainted evidence claims in federal habeas proceedings.  <u>See</u> <u>Stone v. Powell</u>, 428 U.S. 465, 482 (1976) (holding that Fourth Amendment claims that have been fully

litigated in state court may not be basis for habeas relief).  This bar is "is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim." Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002). Generally, a petitioner will have been denied an opportunity to litigate only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992); accord Johnson v. Graham, No. 09 Civ. 5838, 2010 WL 3855286, at *4 (S.D.N.Y. Oct. 1, 2010).

Mr. Fernandez did have a full and fair opportunity in the state courts, and there was no "unconscionable breakdown" in the state review process. Capellan, 975 F.2d at 70. This Court has found an "unconscionable breakdown" where there are serious ethical violations by attorneys and judges. See Allah v. LeFevre, 623 F. Supp. 987, 991 (S.D.N.Y. 1985) (citing examples of "unconscionable breakdown," including "the bribing of a trial judge, the prosecution's knowing use of perjured testimony, and a guilty plea extracted by torture"). This Court has also found such a breakdown

where the petitioner did not have a fair adjudication in state court.  See Cruz v. Alexander, 477 F. Supp. 516, 522-23 (S.D.N.Y. 1979) (finding "unconscionable breakdown" where trial court, Appellate Division, and Court of Appeals all failed to "make a reasoned inquiry" into petitioner's Fourth Amendment claim).

The errors Mr. Fernandez alleges in the trial process do not amount to an unconscionable breakdown.  He argues that his other claims in this case -- delayed arraignment, involuntary statements, and substandard treatment while in custody -- show a sufficiently serious breakdown in state corrective procedures.  (Pet. Reply at 5).  These errors, however, do not come close to the sort of ethical lapses that this Court has found to constitute an unconscionable breakdown.  The petitioner's claim also received a "reasoned inquiry," Cruz, 477 F. Supp. at 522, both at the pre-trial suppression hearing and on direct appeal.  Therefore, habeas review does not provide an opportunity for reaching the merits of the petitioner's Fourth Amendment claims.

2. Tainted Statements Claim

The petitioner next claims that the trial court erred in failing to suppress his written statement to Detective Reyes and his videotaped statement to ADA Krutoy.  (Pet. at 5a).  He argues that he did not receive a "pronounced break between the Miranda

26

violation and [those] two statements." (Pet. at 5a). He argues, therefore, that the Miranda violation tainted his two latter statements. (Pet. App. Brief at 45).

A post-Miranda confession "is admissible unless it was involuntarily made despite the Miranda warning." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007). The Supreme Court has carved out an exception to this sweeping rule, however. It has prohibited officers from deliberately employing a two-step strategy through which they extract a confession, read the suspect his Miranda rights, and then have him repeat the confession. Such a strategy amounts to a constitutional violation because it makes the Miranda warning ineffective. See Missouri v. Seibert, 542 U.S. 600, 611-13 (2004); see also Carter, 489 F.3d at 534 (two-step strategy is unconstitutional because any waiver of Miranda rights must be "knowing, intelligent, and voluntary"). The effectiveness of the warning is determined by "the completeness and detail of the questions and answers to the first round of questioning, the two statements' overlapping content, the timing and setting of the first and second rounds, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert, 542 U.S. at 615.

Under the <u>Seibert</u> factors, the New York courts rightly concluded that the petitioner's latter two statements were not tainted by the earlier violation.  While Mr. Fernandez spoke to Detective Alfonso about his attack on Mr. Hamilton (Supp. Tr. at 175), he made his post-<u>Miranda</u> statement to Detective Reyes and started by discussing his attack on Mr. Freilich.  (Supp. Tr. at 72).  Detective Alfonso finished speaking with the petitioner at 7:00 am (Supp. Tr. at 178-79), and Detective Reyes did not meet Mr. Fernandez or read him his rights until 12:25 p.m. that same day.  (Supp. Tr. at 53).  The petitioner was transported to the District Attorney's office where he spoke to ADA Krutoy.  (Tr. at 132, 147).  Here, the content, location, and interrogator changed between the first (tainted), second, and third rounds of questioning.

These factors all show that the interrogators did not "treat the second round [of questioning] as continuous with the first." <u>Seibert</u>, 542 U.S. at 615.  See <u>United States v. Williams</u>, 681 F.3d 35, 45 (2d Cir. 2012) ("near two-hour passage of time between interviews, and the contrast in setting between the [interview locations] belie coercion" through two-step interrogation).  Therefore, Mr. Fernandez's statements to Detective Reyes and ADA Krutoy were sufficiently attenuated from the statement given to Detective Alfonso, and they were rightly deemed admissible.

The petitioner also argues that his statements to Detective Reyes and ADA Krutoy were not given voluntarily and should have been suppressed on that basis. (Pet. App. Brief at 45). He claims that he was suffering from fatigue and in a "fragile emotional state" during the interrogations. (Pet. App. Brief at 59). However, the trial judge correctly determined that Mr. Fernandez's post-<u>Miranda</u> statements were voluntarily given. Mr. Fernandez received more than a five-hour break from questioning, during which time he slept and was offered food, drink, and new clothes. (Supp. Tr. at 106-07). He also was allowed to speak alone with his girlfriend (Supp. Tr. at 179) and his friend, Tito. (Supp. Tr. at 166-67). These facts show that the petitioner was not subjected to the "coercive police activity" that is "a necessary predicate to the finding that a confession is not 'voluntary.'" <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986). <u>See</u> <u>McMillon v. Culley</u>, 380 F. App'x 63, 67 n.3 (2d Cir. 2010) (finding that officers allowing suspect "to attend his mother's wake and speak with his father" before interrogation weighed in favor of voluntariness). Therefore, because the petitioner's statements were not coerced, the state judge rightly found them voluntary.

### 3. Voluntariness Instruction

The petitioner's final claim is that the trial judge erred in denying his request for a jury instruction on the voluntariness of his confessions.  (Pet. at 5a).  Mr. Fernandez argues that "there was evidence in the record for the jury to assess the voluntariness of the statements" because he "raised [that] factual issue at trial."  (Pet. App. Brief at 60-61).

The "Constitution protects a defendant's right to have the voluntariness of statements determined by a judge, not a jury." Kollar v. Smith, No. 04 Civ. 10175, 2005 WL 1653883, at *7 (July 12, 2005).  This means that, "even though the trial judge ruled on his coercion claim," the defendant is not "entitled to have the jury decide the claim anew."  Lego v. Twomey, 404 U.S. 477, 489 (1972).  Though "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination," Miller v. Fenton, 474 U.S. 104, 110 (1985), the question of which state actor should pass on that issue is not one for the federal courts.[4]  See Lego v. Twomey, 404 U.S. at 489-90.

---

[4] The petitioner relies on Smith v. Texas, 543 U.S. 37 (2004), in arguing that the jury should have been instructed on voluntariness.  (Pet. Reply at 6-7)  He contends that the voluntariness issue constitutes "mitigating evidence" that "reduces the [petitioner's] personal or moral culpability or blameworthiness."  Smith v. Texas, 543 U.S. at 40.  That case, however, dealt with the Eighth Amendment's requirements for capital sentencing and not the Fourth Amendment's requirements for admissibility of evidence.  Therefore, Smith is irrelevant here.

Because the trial judge considered and ruled on the voluntariness of Mr. Fernandez's statements at his counsel's request (Tr. at 207-09), the Constitution does not guarantee him the right to have a jury consider the same issue. New York law might favor the petitioner on this claim.[5] However, the petitioner is only entitled to federal habeas relief if the state proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established <u>Federal</u> law." 28 U.S.C. § 2254(d)(1) (emphasis added). Here, the federal law is clear: the federal Constitution requires nothing more than "a fair hearing and a reliable determination on the issue of voluntariness." <u>Jackson v. Denno</u>, 378 U.S. 368, 377 (1964). Because the petitioner received such a determination at trial, he has no basis for federal habeas relief.

<u>Conclusion</u>

For the reasons above, I recommend that Mr. Fernandez's application to stay these proceedings and hold his petition for a writ of habeas corpus in abeyance be denied. I also recommend that

---

[5] "[W]hen the defense presents evidence at trial sufficient to demonstrate a question of fact regarding the voluntariness of the defendant's statement, the court must submit the issue to the jury with instructions to ignore the statement if it determines that it was involuntarily made." <u>People v. Perretti</u>, 278 A.D.2d 597, 598, 719 N.Y.S.2d 145, 147 (1st Dep't 2000) (cited in Pet. App. Brief at 61-62).

his petition for a writ of habeas corpus be denied.  Pursuant to 28 U.S.C § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objection shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Andrew L. Carter, Jr., Room 725, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          July 12, 2012

Copies mailed this date to:

Richard A. Fernandez
07-A-1578
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582

Priscilla Steward, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271